Argued and submitted October 5, affirmed November 15, 1983, petition for rehearing denied January 10, 1984

STATE OF OREGON,
*Respondent on Review,*

*v.*

ORVILLE JOHN LUTHER,
*Petitioner on Review*

(TC C7-04-31252, CA 17011, SC 29693)

672 P2d 691

Jacob Tanzer, Portland, argued the cause and filed the petition for review for petitioner on review. With him on the petition for review was Wolf, Griffith, Bittner, Abbott & Roberts, Portland. Des Connall, Portland, filed the brief in the Court of Appeals for petitioner on review.

Stephen F. Peifer, Deputy Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

CAMPBELL, J.

Peterson, C. J., concurred and filed an opinion.

## CAMPBELL, J.

The defendant's conviction for second degree manslaughter was affirmed by the Court of Appeals. The defendant petitioned this court for review, assigning as his sole point relied on for reversal:

> "If a witness in a criminal case has been subjected to hypnosis regarding the subject matter of her testimony, evidence, such as by cross-examination, of what occurred during the hypnosis is admissible."

We granted the defendant's petition for review to decide the issue suggested,[1] but now find that we must first decide whether the defendant protected his record and preserved the alleged assignment of error in the trial court. We find that the defendant did not. Therefore, we affirm the result reached by both the trial court and the Court of Appeals.[2] *State v. Luther,* 63 Or App 86, 663 P2d 1261 (1983). We do not reach the issue which the defendant requested we decide.

On April 13, 1979, there was an altercation between the defendant and his nephew, Mark Luther. As a result, the nephew received a gunshot wound to his head and the defendant was indicted by the grand jury for assault in the first degree. Several months later, after the nephew died, the first

---

[1] The defendant, to support his position, relies upon ORS 136.675 and *State v. Jorgensen,* 8 Or App 1, 492 P2d 312 (1971); *People v. Shirley,* 31 Cal 3d 18, 641 P2d 775, 181 Cal Rptr 243, *cert den,* 103 S Ct 13 (1982); *State v. Nazarovitch,* 496 Pa 97, 436 A2d 170 (1981); *State v. Mack,* 292 NW2d 764 (Minn 1980); *People v. Tait,* 99 Mich App 19, 297 NW2d 853 (1980).

He also cites: Beaver, *Memory Restored or Confabulated by Hypnosis-Is It Competent?* 6 U Puget Sound L Rev 155 (1983); Diamond, *Inherent Problems In the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif L Rev 313 (1980); Matthis, *The Admissibility of Novel Scientific Evidence in the Ninth Circuit,* 19 Will L Rev 533, 568 n.175 (1983); Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l J Clinical & Experimental Hypnosis 311 (1979); Comment, *The Admissibility of Testimony Influenced By Hypnosis,* 67 Va L Rev 1203 (1981): Note, *Safeguards Against Suggestiveness: A Means for Admissibility of Hypno-Induced Testimony,* 38 Wash & Lee L Rev 197 (1981); Comment, *Hypnosis - Its Role and Current Admissibility in the Criminal Law,* 17 Will L Rev 665 (1981).

*See also: People v. Hughes,* 33 CrL 2341 (NY, July 5, 1983); *Collins v. State,* 34 CrL 2045 (Md, Sept. 8, 1983); and Note, *Awakening from the Exclusionary Trance: A Balancing Approach to the Admissibility of Hypnotically Refreshed Testimony,* 61 T L Rev 719 (1982).

[2] In the Court of Appeals the defendant alleged seven separate assignments of error. In this court the defendant has set out only one point as grounds for reversal.

indictment was dismissed and the defendant was reindicted for the crime of murder. The trial jury found the defendant guilty of the lesser included crime of manslaughter in the second degree.

The defendant and his nephew had separate rooms on the second floor of Gena Luther's house in the City of Portland. Gena Luther, age 78, was the mother of defendant, Orville Luther, age 45, and the grandmother of Mark Luther, age 21. Although the rooms were across the hall from each other, the doors were not directly opposite. A map drawn to scale and received in evidence shows that the hall was seven feet three inches wide and that from the center of the nephew's doorway to the center of the defendant's doorway was eight feet ten inches.

On the night in question, Gena Luther went upstairs to Mark's room, where he was asleep, to get a set of the defendant's car keys.[3] The defendant followed Gena into Mark's room where a wrestling match occurred between the two men. The defendant testified that after the first physical encounter, he heard Mark threaten, in explicit vulgar language, to kill him and that he heard Gena scream, "You give me that knife" or "Put the knife down." The defendant went to his room and got a hand gun. The nephew was shot by the hand gun in or near the doorway to his own room. The defendant on trial claimed self-defense or accident.[4]

On the night of the incident, Gena Luther told police that she had seen the shooting and that defendant and his nephew were standing in their respective doorways when the defendant lowered his arm and fired the shot. Later she testified before the grand jury on the assault charge, but this testimony was not reported and the record does not disclose what she said at that time. After Mark died, she testified before the second grand jury and told them that she was on her

---

[3] The defendant testified that he was disturbed about the car keys because previously Mark and the defendant's daughter had taken the keys to the defendant's girlfriend's car without permission and wrecked the car.

[4] On trial the defendant testified: "And, I went to my room and he [Mark] was screaming, just completely hysterical, and I went to my room and went in the closet and took the suitcase out and took out my service revolver and I went back over to his room. And we got in a scuffle and a fight there. The next thing the gun went off. I know I didn't have my hand on the trigger of the gun and I was—in a complete total shock and—that the gun ever went off."

way back down the stairs and did not see the shooting. Shortly thereafter she called the district attorney's office and told a deputy that she did not tell the truth when she testified before the second grand jury.[5]

Between the time of the indictment by the second grand jury and the trial of the case, the state had Gena Luther hypnotized.

At the trial Gena's descriptions as to the location of the defendant and his deceased nephew at the time of the shooting varied somewhat from question to question, but she always kept each close to his own doorway. At one point she said: "They were both just outside their doors." At another time she said they were "half-ways" in their doorways. Gena also testified that the gun was three feet away from Mark when the shot was fired. She explained her answer:

"Well, I took the measurements even as late as yesterday of the hall, and, to my measurements, it was eight feet across there and from where Mark was standing and where Orville [defendant] was standing and — Orville reaching out and where Mark slumped."

There is evidence in the record that when Mark arrived at the hospital after the shooting, he had a powder burn the size of a fifty-cent piece on his head. The state's witness from the crime lab testified that in order to produce a powder burn, the weapon had to be fired within three feet of the deceased. The same witness testified that in his opinion Mark was in his doorway or a step or two inside his own room when the shot was fired. This opinion was based upon the location of bullet and bone fragments, the pattern of blood spots, and a point in the ceiling where a part of the spent bullet may have hit.

Because of the foregoing testimony, the defendant wanted to question Gena Luther concerning the hypnosis. Defendant's lawyer unsuccessfully attempted to ask her about what happened while she was under hypnosis:

"[DEFENDANT'S COUNSEL]: * * * After that appearance before the Grand Jury, did [Deputy District Attorney] have you put under hypnosis?

---

[5] At the trial, Gena Luther testified: "Well, that I had gotten emotional and that I wanted it corrected. * * * After all, it was my son and I didn't tell the truth."

"[DEPUTY DISTRICT ATTORNEY]: I object to this * * *."

During a conference in chambers and on the record, defendant's counsel told the court that he was trying to prove that the state's investigator, Robert Bidder, conditioned Gena Luther during the hypnosis by asking suggestive questions about the locations of the defendant and the deceased nephew. Counsel for the defendant argued that the hypnosis caused the witness to change her story.

The trial court ruled:

"Well, my ruling would be that, of course, you would be entitled to inquire as to whether she had been subjected to hypnosis after her appearance at the Grand Jury and to inquire as to whether that changed her recollection of what occurred. I think that's about as far as we can go. I—I would be unwilling to introduce or to permit any testimony to go in about anything she said or did under hypnosis. * * * All your're entitled to show is the difference between the story she told before and the story she tells later, but I am not going to permit any evidence to be presented before the jury regarding what occurred during—while the time she was under hypnosis."

Although Gena Luther was later permitted to answer a similar question about whether she was placed under hypnosis, the above ruling by the trial court was assigned as error on the defendant's appeal to the Court of Appeals:

"The trial court erred in not allowing defense counsel to introduce evidence regarding what Gena Luther said or did while under hypnosis and what type of questions were asked of her."

This assignment of error has now been rephrased and has become the defendant's point relied upon for reversal in this court.

The state's position is that the defendant did not preserve the alleged error by making the necessary offer of proof. It argues that without an offer of proof, the appellate courts have "no way of determining whether the exclusion of the evidence was prejudicial to defendant." *State v. Jenkins,* 246 Or 280, 281, 424 P2d 894 (1967).

The Court of Appeals found against the defendant:

"We do not know what additional questions would have been asked. Assuming that a witness who has been hypnotized is competent to testify as to what occurred while he was under hypnosis, the threshold question is whether the witness states that he knew what happened. If he says he does not remember, that is the end of the matter. Because Gena was not asked, either before the jury or as an offer of proof, whether she knew what happened, we cannot tell whether the court's ruling, assuming it to have been erroneous, was prejudicial." *State v. Luther*, 63 Or App 86, 92, 663 P2d 1261 (1983).

We reach the same result as the Court of Appeals, but for a different reason.

■ ■ The defendant does not question that as a general proposition of law, it is necessary to make an offer of proof by putting in the record the testimony ruled objectionable by the trial court so that the appellate court will have a basis upon which to rule. The defendant contends that the trial court made the alleged erroneous ruling during his cross-examination of Gena Luther, invoking the exception that an offer of proof is not necessary on cross-examination. The exception is stated in *State v. Davidson*, 252 Or 617, 622-623, 451 P2d 481 (1969):

"The rule requiring an offer of proof in order to preserve an error in the exclusion of evidence does not apply to cross-examination, because the cross-examiner has no way of knowing what the answer to the question would have been. *Stillwell v. S.I.A.C.*, 243 Or 158, 162, 411 P2d 1015 (1966); *Beemer v. Lenske*, 241 Or 47, 49, 402 P2d 90 (1965)."

This preliminary phase of the defendant's petition is based upon the premise that the question to Gena Luther was on the defendant's cross-examination. We disagree with the defendant. We find that the following demonstrates that at the time the defendant wanted to examine Gena Luther as to the hypnosis, she was the defendant's witness on direct examination.

The jury was selected for the trial of the defendant's case on Wednesday, December 5, 1979. The state's first witness was called at 9:40 a.m. on Thursday, December 6th. The state's third witness was Gena Luther. She was called sometime during the middle of the same afternoon. After her

direct examination, cross-examination and re-direct examination, without any reference to hypnosis, the following occurred:

> "[DEFENSE COUNSEL]:[6] Your honor, we will have no other questions of Mrs. Luther. I would ask her to remain under subpoena for our case.
>
> "\* \* \* \* \*
>
> "[DEFENSE COUNSEL]: Could Mrs. Luther be asked to remain in attendance for a few minutes?
>
> "THE COURT: Suppose.
>
> "[DEFENSE COUNSEL]: If I am going to call her later, better we do it now.
>
> "[DEPUTY DISTRICT ATTORNEY]: I would much prefer that, Your Honor."

The above is followed by a description by the defendant's counsel to the trial court in chambers as to what he observed on the video tape of Gena Luther's hypnotic session.[7] He refers to the fact that she was questioned by the state's investigator. Defense counsel's pitch to the court was that the state was trying, through the testimony of Gena Luther, to move the defendant and his nephew close enough to fit the physical evidence. This statement was followed by:

> "[DEFENSE COUNSEL]: But if I may say this, I would like to give it a lot of thought because it opens up a lot of collateral issues and delays the trial substantially if it's not going to be of value to my client, I'm not going to pursue it. If it is, — if I

---

[6] Not counsel who argued the petition for review in this court.

[7] The hypnotic session of Gena Luther was recorded on videotape in accordance with ORS 136.675. The videotape was not submitted to the jury: "[DEFENSE COUNSEL]: I would simply say, Your Honor, that the tape does speak for itself. I would request that it be marked as a Defense Exhibit and become a part of the file of this case—not for the submission to the jury but for the record."

ORS 136.675 provides:

> "If either prosecution or defense in any criminal proceeding in the State of Oregon intends to offer the testimony of any person, including the defendant, who has been subjected to hypnosis, mesmerism or any other form of the exertion of will power or the power of suggestion which is intended to or results in a state of trance, sleep or entire or partial unconsciouness relating to the subject matter of the proposed testimony, performed by any person, it shall be a condition of the use of such testimony that the entire procedure be recorded either on videotape or any mechanical recording device. The unabridged videotape or mechanical recording shall be made available to the other party or parties in accordance with ORS 135.805 to 135.990."

think it is of value, then I will want to pursue it. So, what I would like to do is leave the case in this posture. Mrs. Luther could go home and if — if I decide I want to pursue that and the Court permits me to do it, then I would put her on the stand and lay a foundation for impeachment and go forward.

"* * * * *

"[DEFENSE COUNSEL]: Well, the time this is done can be anytime. I just don't want to waive my right on putting her back on the stand and laying a foundation.

"THE COURT: You haven't. We have already stated on the record that she would be available and the D.A.'s office to have her available."

The jury was excused for the day. On Friday, December 7th, five additional witnesses were called and examined as a part of the state's case in chief. Gena Luther was not recalled.

On Monday, December 10th, the state rested its case in chief at approximately 10:00 a.m. The defendant then moved for a judgment of acquittal and renewed all of his previous motions. The trial court denied all the defendant's motions. The defendant then started to present his case to the jury. During the early afternoon hours of December 10th, the defendant called Gena Luther as his fifth witness:

"[DEFENSE COUNSEL]: We'll call Mrs. Luther."

After considerable testimony on other matters, the defendant asked Gena Luther the question which opened the subject that is critical to this petition for review:

"[DEFENSE COUNSEL]: * * * After that appearance before the Grand Jury, did [Deputy District Attorney] have you put under hypnosis?

"[DEPUTY DISTRICT ATTORNEY]: I object to this. We have gone through this.

"[DEFENSE COUNSEL]: We haven't. I was just opening it up, * * *."

The following discussion was held in chambers.

"THE COURT: * * * I would be unwilling to introduce or to permit any testimony to go in about anything she said or did under hypnosis."

"[DEFENSE COUNSEL]: How about leading questions?

"THE COURT: I don't think so.

"* * * * *

"[DEFENSE COUNSEL]: May I make a record on this out of the presence of the jury? We can do that at any time.

"THE COURT: Surely.

"[DEFENSE COUNSEL]: I really do want to make a record on that. I think that it's critical.

"* * * * *

"[DEFENSE COUNSEL]: I understand the Court's ruling and I will make a record some time before the jury comes back on these questions."

"(Whereupon the following proceedings were resumed in Open Court before the jury.)

"THE COURT: You may proceed commensurate with the Court's ruling.

"[DEFENSE COUNSEL]: Thank you, Your Honor.

"[DEFENSE COUNSEL]: Ma'am, after you appeared before the Grand Jury the last time, were you hypnotized?

"MRS. LUTHER: Yes.

"[DEFENSE COUNSEL]: At [DEPUTY DISTRICT ATTORNEY'S] request?

"MRS. LUTHER: Yes.

"[DEFENSE COUNSEL]: When was that?

"MRS. LUTHER: I don't recollect the date."

"[DEFENSE COUNSEL]: All right. And who hypnotized you? Do you recall?

"MRS. LUTHER: Well, either—the man that does the hypnotizing—the judge— I mean * * * [the deputy district attorney] was there. Bidders was there and I forget the name of the doctor that hypnotized me, I'm sorry.

"[DEFENSE COUNSEL]: Okay, Ma'am, did Mr. Bidder ask you questions that day?

"MRS. LUTHER: That I don't recall just who asked the questions.

"* * * * *

"[DEPUTY DISTRICT ATTORNEY]: Your honor, may this witness [Mrs. Luther] be excused?

"[DEFENSE COUNSEL]: Yes.

"THE COURT: I assume you will not need her any further. You may."

It is clear to us from reading the above quoted portions of the transcript that the trial counsel for the defendant considered Gena Luther as a defendant's witness on direct examination when he asked the questions concerning hypnosis. There was no mention of hypnosis during Gena Luther's testimony by either the state or defendant during the state's case. Then, after defense counsel asked that she "remain under subpoena for our case," he played with the idea of questioning her the same afternoon. He concluded that he wanted to think about the idea, but at the same time reserved the right to "put her on the stand and lay a foundation for impeachment." This is not inconsistent with making Gena Luther the defendant's witness. This case was tried before the adoption of the Oregon Rules of Evidence. The impeachment of a party's own witness at the time of trial was governed by former ORS 45.590.[8]

The defendant then waited through the balance of the state's case in chief all day Friday and a part of Monday morning without asking to recall Gena Luther. After the state rested on Monday morning, the defendant moved for a judgment of acquittal and renewed all of his previous motions— again with no attempt to recall Gena Luther during the state's case. The defendant then went into the middle of Monday afternoon when he called Gena Luther as his fifth witness. No attempt was made to define her status such as calling her as an "adverse" or "hostile" witness.[9]

Even after receiving the adverse ruling from the trial court, the defendant in three separate statements in effect

---

[8] Former ORS 45.590 provides:

"The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony, as provided in ORS 45.610. However, when a party calls as a witness either an adverse party or the assignor, agent, officer or employe of an adverse party, he shall not be deemed to have vouched for the credit of that witness and he may impeach the credit of that witness in the same manner as in the case of a witness produced by an adverse party."

[9] We do not imply that the defendant should have called Gena Luther as an "adverse" or "hostile" witness or that it would have made any difference in our decision. We mention this simply as one indication of the overall intention of defendant's counsel.

said that he wanted to make a record out of the presence of the jury. This is an indication that he knew he had to make an offer of proof to preserve the alleged error. Finally, the defendant allowed Gena Luther to be excused without making any objection.

We find that Gena Luther was the defendant's own witness on direct examination when he desired to ask her questions about the hypnosis. There being no offer of proof, we have nothing to review.

**PETERSON, C. J.,** concurring.

I concur in the analysis and result of the majority, but write separately to express my disagreement with a proposition of law which has improvidently appeared in previous opinions, and which is referred to in the majority opinion.

On page 7 of the majority opinion reference is made to a line of cases which are claimed to stand for the proposition that no offer of proof is required when an objection is sustained upon cross-examination.[1] In my quick research, the earliest reference to the rule that I have found is *Arthur v. Parish,* 150 Or 582, 591, 47 P2d 682 (1935). There, the court, in affirming a lower court's order setting aside a judgment and granting a new trial stated, "No offer of proof is necessary as the matter arose on cross-examination." The opinion contains no citation of authority to support the proposition.

Careful analysis of the cases cited in the footnote will reveal that in most, if not all of the cases, the statement is dictum. Dictum or not, no good reason exists for dispensing with the requirement that an offer of proof be made in such a circumstance. The need is as great for an adequate record on appeal whether the question arises on direct examination or cross-examination. Without knowing what the answer of the

---

[1] Cases which make reference to this proposition include *Shepler v. Weyerhaeuser Company;* 279 Or 477, 510, 569 P2d 1040 (1977), *State v. Davidson,* 252 Or 617, 622-23, 451 P2d 481 (1969); *Stillwell v. SIAC,* 243 Or 158, 162, 411 P2d 1015 (1966); *Beemer v. Lenske,* 241 Or 47, 49, 402 P2d 90 (1965); and *Arthur v. Parish,* 150 Or 582, 591, 47 P2d 682 (1935).

witness would have been, the appellate court cannot determine whether the trial court's error in sustaining the objection caused any harm to the appellant, nor can it intelligently pass upon the trial court's ruling. *Schweiger v. Solbeck,* 191 Or 454, 473-74, 230 P2d 195 (1951).